Please be seated. Give us just a minute to get situated. Thank you. Please proceed. Good morning, Your Honors, and may it please the Court. My name is Terrence O'Neill, Assistant Attorney General, and I represent the defendant, Dennis Marinelli. Your Honors, the trial court erred here by substantially negating and nullifying the State's indemnification of Mr. Marinelli, and it did so by completely ignoring the Eleventh Amendment proscriptions against doing so, by extending preemption doctrine generally allowed under 1983 in a manner for which it was never intended. Here, the trial court first and initially recognized, unlike the authority that it primarily relies upon, the Hankins decision from the Eighth Circuit. Let me just ask a quick question about the Eleventh Amendment. So I didn't see much about this in the argument section. I saw just a general assertion. Is this a preserved argument that you're developing? Well, it's preserved only in the sense that the — it's an awkward argument for Mr. Marinelli to make, right? He is not the State of Connecticut. He is a separate, freestanding, individual, retired Department of Correction official. And the trial court below, of course, ruled that it was barred by the Eleventh Amendment from then doing exactly what it did, which is reach the State's indemnification of Mr. Marinelli. In fact, I think the only fair way to read the trial court's decision in this case is to say that the trial court judge disagreed with the State's decision to indemnify Mr. Marinelli and then worked backwards from that outcome to obviate and avoid the Eleventh Amendment bar. Yes, Your Honor. Let's be clear on something here, if you would. The district court did not hold that the indemnification per se was unlawful. Am I correct? That was part of the reasoning leading up to the conclusion that under the whole circumstances here, taking 50 percent of the judgment for cost of incarceration and then another 65,000 essentially as a lien for cost of future, cost of defense, which was apparently based on another state action going on, and those two things in combination with the indemnification caused the district court to conclude that the sum total of the State of Connecticut's actions here were inconsistent and therefore obstructed the purpose of 1983. Am I correct in the way I've done that, or do you disagree and think that the district court ultimately found something unlawful about indemnification? I think replete in the district court's decisions, Your Honor, is the notion of the district court that the State's indemnification was improper. The trial court repeatedly questions the State's decision to indemnify Mr. Marinelli, and it does so probably most clearly in its ultimate conclusion, which is to hold Mr. Marinelli responsible for the entirety of the judgment minus about $15,000 in child support payments, which if the State were to deduct its debts, Mr. Marinelli would then be responsible for paying more than $300,000, more than the judgment. Let me clarify again. There were two decisions here that are under appeal, right? There is the motion of clarification, the 69, and then the one for credit against. Yes, Your Honor. There were two motions, and so it was there were actually two credits that ultimately the district court recognized. Correct? The district court recognized some credits, yes, Your Honor. Right. In addition to the child support credit. Well, it only recognized a portion of what Mr. Williams has received, and it expressly ruled in its last decision before the Court that it was going to stop doing the math on that until after it heard from this Court on the merits of the appeal. So I certainly envision that if this decision unfortunately were to stand, we would be back, Mr. Marinelli would be back before the district court looking for additional credits and trying to parse out what exactly he owes and what he does not. But you're suggesting, you're saying that the district court's decision forbids the State from indemnifying Marinelli? No, Your Honor. What I'm saying is that the practical effect of the decision is that it prohibits the State from indemnifying Marinelli because it deducts, it prohibits any deduction, any payment for legitimate State liens. And it did so by finding that the State was acting. Wait a second. The State, following up on Judge LaValle's question, what prohibits the State from indemnifying? I mean, I see some ambiguity about the State's duty to indemnify where a punitive damages award is made. Because as I read 5141D, it says the State shall save harmless and indemnify officers and so on, but so long as or and such act or omission is found not to have been wanton, reckless, or malicious. And the award of punitive damages here suggests to the contrary that maybe the action was wanton, reckless, or malicious, according to the jury. And so this was a State voluntary decision to indemnify Mr. Marinelli. Literally it was, Your Honor. Is that correct? That's absolutely correct, Your Honor. When I say that this nullifies the indemnification of Mr. Marinelli, what I mean is that it the State did more than that, right? The State not only indemnified Mr. Marinelli, but it applied well-established statutory liens to the amount of money that it indemnified Mr. Marinelli for. And it's impossible, I would respectfully submit, to separate out the two. The trial court struggled with it. Certainly the basis of our appeal is to identify that struggle. There were several separate different actions and decisions that had to be taken. One was the decision to indemnify in the face of a punitive damages award. And the second, third, and fourth, I guess, were one with regard to how to deal with a child support payment, two with regard to the cost of incarceration, and three the cost of the public defender service. And each of those has a different statutory basis and a different rationale potentially for charging against the inmates or Mr. Williams' account. Entirely, Your Honor. But I would suggest that the trial court certainly didn't parse those out. The trial court was driven by its initial, I would respectfully submit to Judge Shade, visceral reaction to the State's decision to indemnify Mr. Marinelli. Well, the district court judge gave a careful analysis of his reasoning about each of those aspects, and it was more than a one-line order saying, I don't like this. Oh, it was more than a one-line? He gave a preemption analysis that is founded in what the Eighth Circuit did and in reason. So it's your job to tell us why that was incorrect. Absolutely. And I'm happy to do so. Certainly the judge wrote, Judge Shade wrote more than one line. That's absolutely correct. But there is no analysis short of attributing the State's motivations to the same motivations that caused Congress to adopt 1983 in the first place. Can you answer a factual question? Is there in the public record any accounting of how often the State applies its cost of incarceration or the public defender statute against incarcerated individuals or formerly incarcerated individuals? There is none in the trial record or in the public record, Your Honor. I would submit that the only place that I could think of for such a source is that other attorneys in my office bring collection matters in the State superior court, usually in the Hartford Judicial District, to collect cost of incarceration. How that would be captioned or gleaned from the public record, I do not know. Is there anything in the Attorney General's office like manual that says you always need to do this when someone has been released from incarceration, maybe earning money? No, Your Honor. There's nothing in our office manual or our office practices that indicate that. So we have no sense from the record, public or otherwise. I can only make a representation to you as an officer of the court as to how the office goes about doing that. And what about the cost of the public defender? I do not know, Your Honor. The cost of the public defender is a separate matter because the public defender, the public defender services commission is a freestanding agency. While the Attorney General's office is charged with enforcing that collection procedure, those are not funds that go into the general fund. They go directly, as the statute says, as we've cited in our brief and in the record. Those funds go directly to the public defender services commission, Your Honor. But still, is there any record about whether that is a routine matter for the Attorney General's office to pursue? I do not know, Your Honor. I do not know. I don't know of anything in the public record to that effect. And do you have any idea whether that's a widespread practice across the United States? I do not, Your Honor. I will note that in the Beeks matter that we rely upon, Beeks expressly notes, the Eighth Circuit expressly notes that included with the cost of restitution, the victim's compensation statute that it upheld in Iowa, cost of defense was part of the statutory scheme that the Eighth Circuit upheld in limiting the Hankins decision, of course. So you also represent in your brief that the Federal Government charges costs of incarceration against formerly incarcerated individual. And I think you were implying that allows offsets against Bivens awards. But I didn't see a very full record on that account. Can you help me? Your Honor, I could not find any. We could not find anything more than that, except that it exists. This is something, as we cited in a journal article, plus or minus 30 states employ. And we're here to defend our statute. Our statute, as you know, adopts. I'm sorry. I'm looking at it. So there are statutes, but we don't have any records about the actual practice. Correct, Your Honor. Is that correct? Correct, Your Honor. And what I would say, I see my time is up, but if I could speak to it. Please continue. What I would say to that, Your Honor, is this. Obviously, Hankins, you know, we have a case more than 20 years old now, informed by Hankins, by the Beeks decision that narrows it, and informed by the Brown decision which we rely upon in our brief from the Eastern District. We have a statute in Connecticut that was written in 2001 in an effort to address some of the concerns in Hankins, but to be consistent with Brown. And what we did was we recognized that perhaps Hankins, in the Hankins matter, where the State chose to take 90 percent of a verdict of an award that was almost entirely exemplary in its nature and purpose, it might go a little far. Exemplary meaning punitive. Meaning punitive, exactly. There's no dispute in the Hankins matter. You have a $3,001 verdict, 3,000 of which were exemplary or punitive damages. They were expressly established to send a message, to serve the deterrent functions, to be almost the civil equivalent of the general deterrent function of a criminal statute, a criminal penalty, right? We have punitive damages that are assessed, not only against the individual to deter him, but also to generally send a message of deterrence to others who might be inclined to act the same way. But doesn't 1983 have both purposes? In other words, it isn't just deterrence. It's also compensation. Correct. And I would respectfully submit, Your Honor, that applying the traditional tort policies and procedures and law that 1983 adopts to address some of these situations, when you're looking at the compensatory nature of the verdict here, setoffs, counterclaims, liens, all of those things are in play. But as the dissent in Hankins and as Brown notices, if you don't recognize that, and if you just go back to the very purposes for which 1983 was applied, you're cutting from whole cloth without any pattern at all. You're making up an unenforceable standard. Can you direct us to any resources that might suggest that Congress is aware of or has considered State collection statutes in the context of 1983? I can't, Your Honor. I'm not aware of any. I am not aware of any. But I would note that here our legislature certainly in passing a statute after Hankins, after Brown, and respectfully after the summary order affirming Brown, looked at making some kind of a balance between recognizing that individuals should be incentivized to bring lawsuits, to challenge misconduct, but on the other hand should be obligated to pay their debts. And our statute strikes that balance in a manner that's very different from Hankins, very different from Hankins. But the statute also suggests that the Connecticut legislature recognized a different situation where punitive damages were awarded, where there's been wanton, reckless, or other egregious conduct that relieves the State of the obligation to indemnify. And nonetheless here, even in the face of that finding and a $400,000 jury award, the State chose to indemnify. So might the balance be struck differently here? I would say no here, Your Honor, because it's one thing to say that the jury, based on a record before it, made a certain decision. But there are other factors that were, in this case, were excluded from evidence, other factors that were excluded. We can't retry the trial. I mean, the judge made his rulings. The appeal was dismissed, was voluntarily dismissed. And we have the finding, plus the remediator from $400,000 to $50,000. Nor am I asking this Court to retry the pleadings below. But as Your Honor pointed out, there was certainly a basis for the State to not indemnify. And I think this is the problem that the trial court struggled with and never got passed, and that is that there is a sense that somehow indemnifying Mr. Marinelli circumvents or somehow negates the decision below of the jury. And I would submit that this plaintiff stands in no different stead than if Mr. Marinelli had paid the judgment, because if he had paid the judgment and the State came in and asserted these liens and asserted these collection methods, what claim would there be? There would be no claim. If Mr. Marinelli had an insurance policy, he means to say. What do you mean, what claim would there be? How could? If Mr. Marinelli paid, the entirety of the trial court's decision seems to be that by the State coming in and indemnifying Mr. Marinelli, that Mr. Marinelli was allowed to avoid the pain and penalty of the verdict against him. Well, that wouldn't be true if he had paid the judgment, right? If he had paid the judgment and the State then asserted its indemnification, its various indemnification statutes, it would be no different than if Mr. Marinelli had an insurance policy that covered all of this, and all he had to do was call his claims adjuster and say, hey, I got this verdict against me. Sotomayor, I think part of the concern is that it's the State who's the payee, so the State is paying the damages award and then taking it all back. And so unlike in the victim restitution kind of context where there's a third party who's receiving money, here it's one payor. And so the State has removed the incentives created by 1983 to conform one's actions to constitutional norms. And that's why the State is here, Your Honor, because that is an egregious and severe thing to accuse the State of Connecticut of in an absence of any record to suggest. In fact, our law presumes the opposite, right? Our law presumes that government officials act in good faith. Well, part of the concern, though, I think, may arise from the unfamiliarity with charging prisoners who don't want to be incarcerated with the cost of their incarceration, charging prisoners who are constitutionally entitled to a defense to the cost of their defense. And one doesn't hear about that generally. That happens routinely, and we've just ascertained that we don't have much by way of statistics about that. So it seems it has a punitive flavor. It has a flavor of negating the jury verdict. And I think that's part of what concerned the district court, and it does concern me. Flavor is one thing, Your Honor, right? Punitive effect is one thing. But to take it to the next step without any record and assume that the State of Connecticut imposed or asserted its statutory liens for some nefarious purpose is completely different. I don't think you have to get that far in order to find conflict preemption. You find an obstacle posed to the goals of Section 1983, which my colleague, Judge Stantz, who has adverted to. And you find actions by statute that created an obstacle to achieving those goals. And we have, you know, different views about what kind of obstacles are sufficient and so on. But I don't think you have to find a preemption. It doesn't ordinarily require, I don't think, the finding of a State nefarious purpose to make a preemption ruling, does it? I think here that was the primary motivation of the decision. That's how I read the district court decision. But even taking your argument, Your Honor's argument and Judge Stantz's argument, here we do not have a situation where we have taken everything. And I would respectfully submit that Your Honors are going down the same path. Kagan. But why wouldn't you be entitled to? I mean, you allege that, you know, he's going to be incarcerated for 30 years, it's $1.8 million. Doesn't the statute give you the right? Or shouldn't you be claiming that you're entitled to everything? Our legislature has assumed that there needs to be some balance. Because I think if you take everything, you take away the incentive to vindicate one's civil rights or one's other tort remedies or any other claims they might have against individuals. And so to avoid the Hankins trap, and to be consistent with what the dissent and what the district court noted in Brown, is that if you go down this road of you underscore the arbitrariness of the rationale behind Hankins and behind the claims charge. So what will be left? I mean, isn't the State entitled to go on in five years, come after whatever's remaining in his account? For cost of incarceration? For cost of incarceration? No, Your Honor. No? No. And 1885B says that. It's limited to 50 percent of the recovery. The statute limits it to 50 percent, Your Honor. 1885B limits it to 50 percent of the recovery. So no, Your Honor. Okay. And the 50 percent of the recovery and, in addition, the counsel fees. Well, the counsel fees, Your Honor, are driven by two different sources, right? There's a — first of all, the public defenders, even this Court, civil rights law, recognizes public defenders are not State actors. They're independent of that. The Public Defender Services Commission stands free. In terms of the compensation of the prisoner for the horrendous abuse that he suffered, he is getting 50 percent of the cost of — he's getting 50 percent of his recovery plus the counsel fees deducted from what he won. Yeah. Or stated another way, Your Honor, he's getting plus or minus $75,000 out of his verdict, which I don't think if the jury came back, any court would entertain — $75,000 out of $300,000. Yes, Your Honor. Yes. And remembering, too, that of that $300,000, $250,000 of it was compensatory damages. It would be susceptible to any — It was compensatory. Correct. Correct, Your Honor. Yeah. So — and I think the distinction is significant because that compensatory purpose is completely different from the purpose served by punitive. So I'm sorry. Just to make sure I'm clear. So of the compensatory award, the statute 1885B says a State can take up to a maximum of 50 percent — Yes, Your Honor. — of the award. And as to the punitive damages, if he had not accepted remittiture, I mean, does that apply to remittiture as well, to the punitive damages? We would have applied it to the entirety of the judgment, yes, Your Honor. The entirety of the judgment. But I recognize that there's two views on that. Now, the case law hasn't gone down that road, but I would submit that the most harmonious way of reading what our — what the Eastern District did in Brown with what the majority did in Hankins and what the Eighth Circuit then curtailed, cut back in Beeks, is that certainly 1983 damages awards can serve multiple purposes. And here, because of the way the case was presented to the jury and the verdict was returned by the jury, we can actually delineate and parse out what was awarded to Mr. Williams by means of compensatory damages and what percentage of the verdict was sent to — was intended to send a message to others. I don't want to prolong this, but I do want to ask you about Beeks. You say Beeks in some way limited Hankins, but Beeks was about victim restitution, which was part, essentially, of the sentence. That, to me, is a very different thing than cost of incarceration, which was at issue at Hankins. In other words, I don't see it as a limitation because it was an entirely different path of reasoning, but there is the general principle, Felder, that 1983 can have a preemptive effect, is there not? The Supreme Court has recognized in general, specifically with notice of filing fees, correct, that 1983 in some circumstances can preempt a State law. So I'm not so sure that I can agree with your assertion that Beeks is somehow a limitation. Can you amplify a little bit? I'd be happy to, Your Honor. First of all, the Eighth Circuit itself says that Beeks is a limitation on Hankins. Beeks recognizes that it refers, much as our Eastern District decision in Brown refers to the unique circumstances of Hankins. And my interpretation of that language, Your Honor, is the unique circumstances of Hankins is that you had, except for a dollar, entirely exemplary, entirely punitive damages. You had nominal damage award for compensation. You didn't prove actual harm. But you had a jury that decided that a message had to be sent. And then the State came in and completely undermined that message by taking 90 percent of a punitive damages award. In Beeks and in Brown, you have recognized – and the majority itself in a footnote in Hankins recognizes that under those unique circumstances, they're deciding that case narrowly. And that was an effort to curtail, I suppose, what the dissent was saying, which is that if you arbitrarily decide that preemption bars State collateral lien assertions without some citation, without some reasoning, then you swallow everything and you preclude all efforts to collateral lien collect from a judgment. So that's what I mean when I say that Beeks recognizes that. Brown recognizes that. And that's the problem that we have here, Your Honor. The underpinning for the trial court's decision here is to cite back to the very purposes that 1983 was passed in the first place. There's no evidentiary pattern to show that the State asserts these things arbitrarily or maliciously. There's also no pattern to show that the State engages it repeatedly in the kinds of conduct that led to the award of punitive damages in the first place here. All that is visited upon the State here, and to the detriment of Mr. Marinelli, is that there is some evil afoot here. And nothing could be further from the truth. Mr. Williams received compensation. He received $75,000 in compensation. He has that money. In fact, the record indicates that he has spent a lot of that money. All right. We'll hear from your adversary. Thank you very much. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. My name is Tyler Butts. I'm here on behalf of the plaintiff appellee Rashad Williams. Defendant appellant Dennis Marinelli has failed to provide a compelling argument as to why the district court erred in holding that the actions of the State of Connecticut in indemnifying its employee, Mr. Marinelli, from a civil judgment, including a punitive damages component, and then using State laws to claw back a large portion of those amounts paid, conflict with or thus preempted by Section 1983. And for that reason, Mr. Williams respectfully urges the Court to affirm the district court's comprehensive, thorough, and well-reasoned opinion. I think it might be the most productive use of my time to address a couple of the questions raised by the panel to my colleagues, starting with Judge Stansu. I believe your question dealt with what the district court actually ordered, and my colleague's response was, well, that it prevented the State from indemnifying Mr. Marinelli. I would submit that that's an inaccurate or an incomplete reading of Judge Shea's ruling. I think the district court was well aware of the Eleventh Amendment, of the potential Eleventh Amendment issues that it was — could run into, and to that end took great pains to explain in its opinion why it wasn't taking any particular action against the State, but was instead concluding that the effect of the State's actions was to prevent Mr. Williams from having been compensated by Mr. Marinelli. So I disagree that the holding of the district court is that indemnification is inappropriate. In fact, the district court's opinion goes to some length to explain that it's not But the end result of the State's actions in electing to indemnify a punitive damages award and then attempting through various State statutes to claw back that award had the effect of not satisfying the judgment held by Mr. Williams — by Mr. Marinelli. You also asked a question about to what extent the award has been reduced. My colleague correctly identified that Mr. Williams didn't contest to a reduction of about $15,000 to be paid for child support liens. In the last motion on appeal, Judge Shea's order on a motion for credit against judgment, I believe Mr. Williams also took credit for amounts that he had previously spent while incarcerated in the commissary. So I think the current amount of the judgment is about $270,000. What was the amount of the attorney's fee? Your Honor, that case is still ongoing. The amount set forth in the underlying State complaint by the State of Connecticut is $48,000. They have frozen — the State has frozen $65,000 in Mr. Williams' prison account and has indicated in some of their briefing papers that they will be seeking amounts in addition to the $48,000 set forth in the complaint. And I would also note — What is the 50 percent figure applied to? We start with $300,000. Correct, Your Honor. Which $250,000 is compensatory and $50,000 is exemplary or punitive. Correct. And what is the 50 percent applied to? Because the statute says 50 percent after payment of all expenses connected with the cause of incarceration, which I guess includes attorney's fees? No, Your Honor, I don't think it would. I think it's the daily rate that the State of Connecticut charges its inmates for the privilege of being housed by the State. To answer your question more directly, the $300,000 award was divided up into three $15,000 went to satisfy a child support lien to a third party, and then half of the remaining amount, which is approximately $287,000, was cut in half without any attempt to distinguish what money from what award went into what half, and Mr. Williams was deposited half and the other half was never deposited to Mr. Williams. It just went into a different pocket of the State of Connecticut. To Judge Carney's point — Do you agree that there's no record evidence or no public record showing that the efforts by the State to cover the cost of incarceration and the cost of the public defender service in the way that it did are anything other than its usual practice under the statute that's been in place for 15 years or whatever? Your Honor, I don't believe there's anything in the record that would indicate one way or another whether or not the State's actions were normal or not. I would say that with respect to the public defender fee action, which was only commenced against Mr. Williams when he raised the issue of whether or not the cost of incarceration, that issue was raised in the summer and this public defender fee action was brought in the fall, I think the district court was considerably concerned by the timing of that and, to Your Honor's point, the possibility that it could at least appear punitive, attempted to claw back more than it had initially done so. And to Your Honor's point about what Mr. Williams may be left with, I know the State has — or I guess Mr. Mariner's counsel represented by the State has indicated that Mr. Williams may walk away with $75,000. I don't believe that that is totally accurate because the underlying public defender fee action is ongoing, and I believe there's evidence from the record to indicate that there's at least one habeas petition being filed on behalf of Mr. Williams or at least that a habeas action is ongoing. So I think the specter is raised of additional public defender fees accruing in the near future, which would then further reduce the amount of his — we'll call it his take-home money. And I think that's actually an important point with respect to the deterrence factor of 1985. I'm sorry. You're saying that Connecticut public defenders are representing him in his habeas? That's correct, Your Honor. I believe there's evidence in the record that there's an ongoing habeas action right now. And that Connecticut public defenders are acting on his behalf in it? Correct. But to the point about deterrence, which we talked a little bit about, I think that applying a public defender fee lien to act to amounts that could be obtained by a 1983 plaintiff serves an incredible disincentive for a plaintiff to bring a 1983 action if they have been harmed, perhaps not extensively, perhaps not greatly. But if I'm a prisoner, I have been harmed, and I feel like my constitutional rights have been violated. But I also know that in the last 10 years I've used the services of a public defender. I'm much less likely to bring a 1983 action, which I think runs directly contrary to the whole purpose of 1983 in the first place, which is to satisfy constitutional violations of my rights. Well, what about the cost of incarceration limit? There is this limitation that the legislature imposed, and the 50 percent limit on any recovery in a cause of action, right? And, you know, management of prisons is an area typically controlled by the states and managed by the state. These kind of statutes seem to be widespread. Indeed, the federal government seems to have one. Why is that, with the limitation kind of balance that your colleague pointed out, why should we find there's such a sharp conflict as to override the Connecticut statute in this circumstance? Yes, Your Honor. I think the district court found persuasive the analysis in Hankins, both in the lower court and the Eighth Circuit, which described the state taking money from its pocket to pay an indemnity judgment and then taking it back as a shell game, which doesn't serve to compensate the injured party at all. And recognizing that this matter before you. Would you be making the same argument if Mr. Marinelli had paid the damages award? No, Your Honor. If Mr. Marinelli was a wealthy individual and had the means to satisfy a judgment in the State of Connecticut, was not going to indemnify him for his actions, we wouldn't be here. We would be outside the realm of Hankins and outside the realm of that case. But then the State would be entitled to go and assert the cost of incarceration offsetted against that recovery. Is that right? Correct, Your Honor. I think the district court very narrowly tailored its ruling to a factual situation we find here, which the district court described as peculiar. I don't think they meant that in a pejorative way. I'll describe it as unique, unique at least as it hasn't occurred since Hankins, and that's you have a State inmate whose constitutional rights are violated by the State employee. The State then chooses to indemnify that State employee's award, including punitive damages, and then it tends to claw back for itself. But what is the rule still? I mean, the State ordinarily indemnifies its employees. It doesn't have to in some circumstances, but it's required to in many circumstances. And, you know, the district court added up and found it was going to be a 70 percent diminution of the monies awarded, and that nullified the effect of the judgment. But at the same time, you know, so if it were just 50 percent, would that not be enough nullification? If it's 40 percent, I mean, you still have the kind of clawback shell game argument. So what are we really dealing with here? What rule should we derive from the district court's action? Yes, Your Honor, we would still be here if it were just the cost of incarceration lien. I think the district court rightly noted that we will find ourselves in a worse situation because the State chose to do what it did. You know, I don't hear Mr. Marinelli advocating for a bright line rule. I'm not sure one is necessary in this case because it doesn't seem to occur that frequently, at least with respect to how many appellate cases there are in this situation. The last one we could find is Hankins. So I don't think we need a bright line rule. I would say that the district court was correct in looking at the collective nature of the State's actions. Excuse me, but we may not have a lot of reported decisions, but we do have 1983 awards. We have medical indifference claims all the time, for example. And if various rewards are made, do we need to be telling States to be cautious in applying any cost of incarceration recovery against an inmate's account? I think if the court were to find itself in a similar situation that I presented here, where there was an award of punitive damages of finding that the State employee acted recklessly and the State nonetheless chose to indemnify, the State is making that affirmative choice to not be able to collect its cost of incarceration lien. So it's the punitive damages that distinguishes this from just the ordinary compensatory 1983 award, in your view? I would say it's the punitive damages, Your Honor, but it's also the punitive acts that gave rise to the constitutional violation. I think if you read the district court's opinion, you'll see that the district court was bothered not only by the fact that punitive damages were awarded, but that the jury made a finding that the actions were committed maliciously or with reckless indifference. And that's sort of the position advocated by the ACLU of Connecticut in its amicus brief, is that the fact of punitive damages isn't the determinative factor, but rather the reckless or intentional malicious actions that gave rise to punitive damages that takes us outside an ordinary case. The use of the word clawback seems to me to be potentially distorting, because correct me if I'm wrong, but as I understand the law, the statutory right of the prisoner doesn't depend on whether Connecticut indemnified Marinelli paying the judgment. If Marinelli paid the judgment himself, the statute gives Connecticut the right to take the money no matter who the judgment was against, even if it was against someone who has nothing to do with Connecticut for an automobile accident or something like that that occurred prior to the incarceration. If the prisoner wins a judgment and gets money, Connecticut has the right to take back 50 percent of the costs of incarceration. Isn't that right? That's correct, Your Honor. I say to take back. I mean to take. To take, not to take back. To take the costs. Correct. I believe the term clawback is being used only because the money first came from the State of Connecticut and then returned to their pockets. If it were the situation you described where you had a third-party payor who wasn't from the State of Connecticut, it wouldn't be a clawback. It would be the State recovering on its lien. But the issue of conflict with 1983, of course, occurs only in the context where the judgment is based on misconduct by State officers, and it occurs with respect to the compensatory aspect of 1983 regardless of whether the State indemnifies the State actor. As to the punitive aspect, the State's indemnification eliminates the deterrent effect intended by 1983. Your Honor, I think that's right. And in this particular case, again, I think the district court was troubled by the facts of the situation as a whole and the State's actions with respect to the award entered in favor of Mr. Williams. And I think the Court need look no further than the specific facts of this case as applied to the district court's analysis. Thank you. Oh, go ahead. Okay. Very, very quickly. I know we're over the time. I'm looking ahead now. If we were to rule, as you are advocating, that preemption here did occur either as to the incarceration clawback or as to the lien, the $65,000 lien, which you're saying may grow, probably will given the habeas, I'm wondering if we were to rule that way, and the judgment gets satisfied eventually. Once the judgment is satisfied, the district court no longer has jurisdiction. Am I correct? If the jurisdiction is based upon the inherent power of an Article III court to enforce its judgments. What about the res judicata effect of our ruling on subsequent actions by the Wouldn't there be a possibility that Connecticut couldn't get either one because of the effect of our ruling, depending on how broad or how narrow it is? Isn't this a problem that we must have to deal with here? I don't think so, Your Honor. And I think the district court thought about this situation. I believe it was in a footnote, and I can't recall if it's in the initial motion or on the motion for clarification, which indicated that when a judgment is paid, the parties usually reach some agreement. And my understanding is in most 1983 cases where a state is indemnifying its employee, there is some discussion between the parties about whether or not the state will choose to enforce its liens against the amounts that it is paying, and that's the ordinary course of how these things go, I think. We don't know any of that, do we? None of that has happened. Your Honor, from all intents and purposes, the state is still indemnifying Mr. Marinelli, and Mr. Marinelli, who is the party to this appeal, is being represented by Attorney O'Neill from the State Attorney General's office. There's been no indication that the state will not, in fact, continue its obligation or its expressed promise to Mr. Marinelli to pay the judgment. I'm just worried. I'm just referring to what happens after that with respect to future actions by the State of Connecticut under the very two statutes that we're alluding to here, public defender and incarceration. Your Honor, I think it's an interesting question. We're not there yet. I would like to believe that the State of Connecticut would follow its obligations with respect to both Mr. Marinelli and as set forth by the district court. It doesn't have an obligation to Mr. Marinelli. Your Honor, it's elected to indemnify him, and as I said earlier, it shows no indication of pulling its indemnification or defense obligation back. Okay. Thank you. Thank you, Your Honor. Okay. Mr. O'Neill, you have a minute rebuttal. Thank you, Your Honor. Feel free to take an extra minute or two. I appreciate that, Your Honor. I suspect you will as well. Your Honor, I would respectfully submit that the questions to my adversary underscore the dilemma that we have here. And that dilemma is that we have a situation where you're being asked to set a rule which says something like this. If the State of Connecticut chooses to indemnify an employee who has an adverse judgment on a 1983 case, the State is precluded from asserting any of its statutory liens. I think the your adversary suggested that this verdict is distinguished by the punitive damages award. Even still. Even still. If the rule you're being asked to impose is that the State is precluded from asserting any statutory liens as to, in a situation where it chooses to indemnify an employee where there is a punitive damages award, but the State is not precluded from doing so, if that employee pays the judgment, that decision, that makes no sense. And that is where the rationale of Hankins collapses. My adversary respectfully, Your Honor, I heard my adversary concede that he would not be here if Mr. Marinelli had paid the judgment. I have no concern with whether he would be here or not be here. My understanding, and perhaps I'm incorrect, is that the gist of the ruling is, at least in my understanding, that the State is precluded from asserting any statutory liens as to, in a situation where it chooses to indemnify an employee where there is a punitive damages award. And as I understand it, the effect of the ruling is to say that the State of Connecticut may not enforce these statutes as to the recovery of the cost of imprisonment when the judgment won by the prisoner is against a State employee, at least in circumstances where there was a conduct warranting punitive damages, regardless of whether the State of Connecticut indemnified or didn't indemnify, because the exercise of the statutory right to seize 50% of the judgment won by the prisoner where the tortfeasor was a State employee would both, in the case where there's no indemnification, where there is indemnification, would defeat the deterrent objective, and in either case it would also defeat the compensatory objection, object of 1983. Which is exactly the rationale that Brown rejects, Your Honor, that the dissent rejects in Hankins, which is that under those circumstances, Your Honor, then there can never be any assertion of a government lien in a situation where the State chooses to indemnify an employee. And what would be the basis for that? That is exactly what Beeks turns on. That's exactly what Brown turns on. The basis asserted by the district court, as I understand it, is that the Connecticut statute, the enforcement of the Connecticut statute against the judgment won by the prisoner, substantially defeats the objectives of 1983. Respectfully, Your Honor, I don't see how it could. Because what we're going to do, then what Your Honor is saying is that the only way that an individual who brings a 1983 action is vindicated by being sure, is by being sure that he collects 100 percent of his judgment or her judgment. And then there's the other. And it's not necessarily 100 percent, but in this case it's 50 percent that's being deducted. That doesn't mean necessarily that if Connecticut purported to take 15 percent, that would also be bad. And that's where the rationale of Hankins fails. That's what Brown points to. That's what Beeks points to. Once you go down that road, Your Honor, you're inviting arbitration. Where is the line? How does one draw the line? So maybe the line is where there's a punitive damages award on a 1983, a constitutional violation, right, that's been federally recognized. The State may not charge the cost of incarceration against that award. Except that as Brown notes, that elevates 1983. As important and critical a purpose as 1983 serves, and I do not say this lightly, Your Honor, that elevates it to a status for which it was not intended and for which there is no case law to support it other than Hankins. It has a constitutional aspect that most statutes don't. It most certainly does, Your Honor. But ever since it passed, Your Honor, 1983 was an imperfect act. It was imperfect in the sense that it imposed for the first time and gave to Congress and the Federal courts for the first time the authority to enforce the Bill of Rights against the States, recognizing that because of its imperfection, because it was a jurisdictional statute that creates a cause of action and no more, that courts from time since have to draw from common law to interpret the scope and the applicability of that statute. The trial court didn't do that here. The trial court didn't look into the longstanding recognition that liens and attachments apply to judgments all the time. Instead, it looked backwards, all the way back to the initiation of 1983, all the way to its passage. And it imputed the State of Connecticut's actions here to the actions of the States that led to the passage of 1983 in the first place, without any record for doing so, without any record, any evidence, any history for doing so. Kagan. Is there any record evidence suggesting that the Connecticut legislature had 1983 awards in mind or did not have them in mind when it passed the cost of incarceration recovery statute? Not directly, Your Honor. The only thing I would say is indirectly, because clearly it follows Hankins, Beeks, and Brown. And because it sets a threshold. But those were not marquee decisions still. I mean, these were, this could as handily address tort recoveries, as Judge LaValle pointed out, right? Certainly not marquee decisions. But given the paucity of authority in this field, Your Honor, I think it's reasonable to assume that the legislature knew of them. Very good. Thank you very much. Well argued. We'll take the matter under advisement. Thank you, Your Honor. And that concludes our calendar for today. We have one matter on submission, United States v. LaPorte. And the clerk will please adjourn court. Court is adjourned. If I went second, I wouldn't stick around to see you.